# In the United States District Court
# For the District of Minnesota

|  |  |
|---|---|
| Raymond Kvalvog and Katherine Kvalvog, Individually and as Co-Trustees of the Heirs of Zachary and Connor Kvalvog, Plaintiffs, | Case No.:  21-1569 |
| v. | COMPLAINT AND JURY DEMAND |
| Park Christian School, Inc., A Minnesota Corporation, Christopher Nellermoe, Kent Hannestad, Josh Lee,  Tim Kerr, The State of Minnesota, Minnesota State Patrol, Rodney Eichens, Brian Cheney and Matthew Langer, Individually and as Employees of the Minnesota State Patrol. Defendants. | |

THE  PLAINTIFFS,  RAYMOND  AND  KATHERINE  KVALVOG,  INDIVIDUALLY AND  AS  THE  CO-TRUSTEES  OF  THE  HEIRS  OF  ZACHARY  AND  CONNOR  KVALVOG, BY  AND  THROUGH  THEIR  ATTORNEY  OF  RECORD,  DAVID  J.  CHAPMAN,  OF  D  J CHAPMAN LAW. P.C. ALLEGE AS FOLLOWS:

## JURISDICTION AND VENUE:

[¶1]    The  Court  has  jurisdiction  under  Article  III  of  the  Constitution  of  the  United  States, federal  statutes,  including,  but  not  necessarily  limited  to  28  U.S.C.  §1331  as  it  both  arises  under the  Constitution  and  Laws  of  the  United  States  of  America,  and  because  it  presents  questions  of federal  law.

[¶2]    This  action  arises  under  the  Due  Process  and  the  Equal  Protection  clauses  of  the Fourteenth  Amendments  to  the  United  States  Constitution,  the  First  Amendment  to  the  United States  Constitution,  is  of  a  remedial  nature  for  violations  of  the  same  pursuant  to  42  U.S.C.

§1985 and 42 U.S.C. §1983; the Minnesota Constitution; and Minnesota law, both statutory and common law.

[¶3]    This action is timely under M.S.A. §541.07, subd. 1, as the alleged misconduct leading to this claim is continuing and ongoing as of the writing of this complaint.

[¶4]    Pursuant to 28 U.S.C. §1391, the proper venue is the United States District Court for the District of Minnesota, as the Defendants all reside in the State of Minnesota or are a state entity.

## STATE SOVEREIGNTY, LIABILITY AND NOTICE:

[¶5]    The Plaintiffs allege that they are entitled to compensation based on ongoing tort liability and violations of their constitutional rights.

[¶6]    The Plaintiff alleges the State of Minnesota is the ultimately responsible party for liability of the defendants Minnesota State Patrol, Eischens, Cheney and Langer as founded on state constitutional and common law, federal constitutional, and statutory law and upon M.S.A. §§3.732, 3.736 and related sections of Chapter 3 of the Minnesota Statutes Annotated, as they relate to Settlement of Claims by the State.

[¶7]    The Plaintiffs allege in this Complaint that they have suffered a violation of their civil rights guaranteed to them by the federal and state constitutions and statutes. 42 U.S.C. § 1985 and 42 U.S.C. §1983.

[¶8]    The Plaintiffs assert that they have provided notice of their claim to the State of Minnesota through the provision of a copy of this complaint.

## THE PARTIES:

[¶9]    The Plaintiff, Raymond Kvalvog is a resident of the City of Moorhead, County of Clay, State of Minnesota.

2

[¶10]   The Plaintiff, Katherine Kvalvog is a resident of the City of Moorhead, County of Clay, State of Minnesota.

[¶11]   Zachary Kvalvog was eighteen (18) years of age, a citizen of the United States and a resident of the City of Moorhead, County of Clay, State of Minnesota, when on June 23, 2015, his life was tragically lost in a motor vehicle crash on Interstate 94 Southbound near Dalton, Minnesota.

[¶12]   The Plaintiffs, Raymond and Katherine Kvalvog, Zachary's parents, were appointed as trustees of the heirs in the case of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015).

[¶13]   Connor Kvalvog was fourteen (14) years of age, a citizen of the United States and a resident of the City of Moorhead, County of Clay, State of Minnesota, when on June 23, 2015, his life was tragically lost in a crash on Interstate 94 Southbound near Dalton, Minnesota.

[¶14]   The Plaintiffs, Raymond and Katherine Kvalvog, Connor's parents, were appointed as trustees of the heirs of Connor Kvalvog in the Clay County, Minnesota case of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015).

[¶15]   The plaintiffs are represented herein by David J. Chapman, DJ Chapman Law, P.C., 3155 Bluestem Drive, PMD #188, West Fargo, ND 58078.

[¶16]   The Defendant, Park Christian School, Inc., dba Park Christian School (hereafter "Park Christian School" or "PCS") is a Minnesota non-profit corporation established in

3

1981 with its initial filing with the Minnesota Secretary of State and having its principal place of business located at 300 N. 17th Street, Moorhead, MN 56560.

[¶17]   Park Christian School is currently in good standing with the Minnesota Secretary of State but has no currently registered agent with its President listed as Christopher Nellermoe, 300 N. 17th Street, Moorhead, MN 56560.

[¶18]   The Defendant, Christopher Nellermoe, (hereafter "Defendant Nellermoe") is currently the President of the Defendant, Park Christian School, Inc., but served as its Principal when the crash resulting in the tragic deaths of Zachary and Connor Kvalvog occurred.

[¶19]   The Defendant, Kent Hannestad, (hereafter "Defendant Hannestad") was the President of Park Christian School when the crash resulting in the deaths of Zachary and Connor Kvalvog occurred, but he has since left the employ of Park Christian School.

[¶20]   The Defendant, Josh Lee (hereafter "Defendant Lee") was the head basketball coach at Park Christian when the crash resulting in the deaths of Zachary and Connor Kvalvog occurred, but he has since left the employ of Park Christian School.

[¶21]   The Defendant, Minnesota State Patrol, (hereafter "Minnesota State Patrol" or "State Patrol") is a Division of the Minnesota Department of Public Safety and is represented by the Office of the Minnesota Attorney General, 1100 Bremer Tower, 445 Minnesota St., St. Paul, MN 55101.

[¶22]   The Defendant, Sargent Rodney Eichens, (hereafter "Defendant Eischens") upon information and belief, resides in Becker County, Minnesota and on or about June 23,

4

2015, and at all times relevant herein, was an employee of the State of Minnesota, Minnesota Department of Public Safety, Minnesota State Patrol.

[¶23]   The Defendant, Captain Brian Cheney, (hereafter "Defendant Cheney") upon information and belief, resides in Clay County, Minnesota and was, at all times relevant herein, an employee of the State of Minnesota, Minnesota Department of Public Safety, Minnesota State Patrol.

[¶24]   Between on or about June 23, 2015, and at all times relevant herein, the Defendant, Cheney was the officer with supervisory authority over the Defendant Eichens.

[¶25]   The Defendant, Colonel Matthew Langer, (hereafter "Defendant Langer") at all times pertinent herein, was the Chief of the State Patrol, having been appointed to that position in January of 2015.  Upon information and belief, at all times pertinent herein, he had supervisory authority over the Defendants Cheney and Eichens.

## THE FACTS:

### *1.  Park Christian School, the Kvalvogs and the fatal crash of June 23, 2015:*

#### [a.]    The Kvalvog Family on June 23, 2015:

[¶26]   On Tuesday, June 23, 2015, on or around 9:08 a.m., two young men with futures filled with great opportunity and promise, Zachary Raymond Kvalvog, born February 17, 1997, age eighteen (18) and his younger brother, Connor Phillip Kvalvog, born February 22, 2001, age fourteen (14), were killed in a tragic, but undeniably preventable motor



**Illust. 1: Connor (top & #31) and Zachary (#10) Kvalvog**

vehicle crash southbound on I-94 at mile marker 68, just beyond Dalton, County of Ottertail, State of Minnesota.

[¶27]   During the prior academic year, Zachary and Connor Kvalvog, <u>See</u>, Illust. 1, were the focus of their proud parents' lives and had been students and rising athletic stars at Park Christian School, a small religiously affiliated school in Moorhead, Minnesota.

[¶28]   Zachary Kvalvog served as the captain of the PCS varsity basketball team, football team and the track team and his younger brother had just made the varsity team at age thirteen (13), which is well before most players would be expected to do so.

[¶29]   On that bright and sunny morning of June 23, 2015, the two young men were scheduled to travel to a Park Christian School team event, namely, a basketball tournament in the State of Wisconsin at the Wisconsin Dells, but tragically they never arrived at their destination and after relinquishing their care and control to PCS and coaches Josh Lee and Tim Kerr, their parents never saw their sons alive again.

[¶30]   The death of their sons led to a quest for justice; a quest diametrically opposed to the need of Defendant PCS to deny justice in order to avoid liability.

[¶31]   The effort of Defendant PCS to avoid liability culminated on July 26, 2019, when justice was denied the Plaintiffs with a jury verdict absolving the Defendant Lee of liability and, thereby, absolving the Defendant PCS as well.

> **[b.]   Park Christian School displayed a leadership culture of racial and religious intolerance toward the Kvalvog family, and the control they exercised through pressure upon the family was primarily responsible for the Kvalvog boys even being on this trip.**

[¶32]   Defendant PCS maintained a coercive and controlling environment for students and their families, which laid the foundation that led inexorably to the tragic deaths of Connor and Zachary Kvalvog.[1]

[¶33]   The culture of Park Christian School, as fostered by administrative leadership at the school, namely, Defendants Hannestad and Nellermoe, controlled the Kvalvog boys through pressure upon them and their parents and this control was primarily responsible for Zachary and Connor Kvalvog participating in the Wisconsin Dells tournament.

[¶34]   The coercive environment of the Defendant PCS reached the athletics program and infiltrated every part of a student's year.

---

[1] Note that this Complaint does not seek to address liability for the deaths of Zachary and Connor Kvalvog but seeks only to address liability for conduct following the deaths of the two young men that culminated in the jury verdict of July 26, 2019.

[¶35]   Students were required to participate in athletic activities outside of the confines of the calendar year at PCS in violation of Minnesota State High School League ("MSHSL") rules, which PCS regularly flaunted or completely failed to follow. Somewhere Zach and captain of the team was commanded to arrange transport of athletes to events—undue influence.

[¶36]   Defendant PCS, by and through its employees, agents and assigns routinely conducted summer athletic activities and the Wisconsin Dells tournament was a prime example of those activities and was rife with numerous MSHSL rule violations by Defendant PCS, including, but not necessarily limited to:

1) Coaches failing to seek any waivers from the MSHSL to coach or to conduct school athletic practices during the off season.

2) Failure by Defendant PCS and its coaches, including, Defendants Lee and Kerr, to abide by the MSHSL rule that no undue influence be applied to any player to induce them to participate in off season practices even if the coaches had actually secured waivers because such off-season activity was wholly voluntary under the rules.

3) Requiring student athletes to maintain journals or logs of their athletic activities during the summer that effected their fall team placement.

4) Applying undue influence to captains of sports teams such as the varsity basketball team where the Captain's duty was defined by Coach Lee to include arranging transportation to and from team events for the team.

5) Operating under the understanding that teams and captains were picked during the summer months, thus, exerting undue influence on players to comply with summer activities or face a loss of opportunity for team placement or captaincy.

6) Conducting practices from 6:00 a.m. to 8:00 a.m. every weekday during the summer, which students felt compelled to participate in because failure to do so cost them fall opportunities for team placement or leadership.

7) Even with waivers to practice and no undue influence being applied, the Wisconsin Dells event was not permitted absent special permission being sought from the MSHSL to take a team to the event, permission which was not sought.

8) Even with waivers to practice and no undue influence being applied, 7 man football participated in out-of-state in Casselton, North Dakota, was not permissible absent special permission, which was not sought.

9) Even with permission to participate, Defendant PCS was prohibited from paying any entry fees for students and yet they did pay those fees.

[¶37]  Defendant Lee had arranged participation in the tournament, but the Plaintiff Raymond Kvalvog was not enthusiastic about his sons participating because Zachary Kvavlog would miss out on another event with college recruiters to be held at the same time.

[¶38]  Participation in the tournament was not voluntary for Zachary or Connor Kvalvog.

[¶39]  Plaintiff Raymond Kvalvog sought to extricate the boys from tournament arrangements and indicated to Defendant Lee that he would even be willing to pay the school back for the entire tournament fee.

[¶40]  Defendant Lee refused to allow the boys out of the tournament, and he used pressure to compel participation.

[¶41]  Defendant Lee indicated that as Zachary Kvalvog wanted to attend North Dakota State University ("NDSU") and play basketball, that Defendant Lee held a lot of influence and that his good or bad reference for Zachary would influence decisions at NDSU.

[¶42]  Not wanting to jeopardize his son's future, Plaintiff Raymond Kvalvog relented and agreed the boys could participate.

[¶43]  This was not the first incident of coercion directed at the Kvalvogs, and on one prior occasion, Zachary did not participate in an event the school attempted to coerce him to participate in due to a conflict in scheduling and he was instead assigned a punishment task of cleaning the school.

[¶44]  Although control was endemic to Defendant PCS's culture, the Kvalvogs were singled out for special scorn where they were considered part of Defendant PCS's outer family and not good enough Christians.

[¶45]  Defendants Hannestad and Nellermoe both indicated to others that Plaintiff Raymond Kvalvog was "of the devil" and that the Kvalvogs were an "outside family".

[¶46]  The coercive environment taught Zachary Kvalvog to remain quiet and comply and even to write in his mandatory Student Faith & Intention intake in response to the question, "What would make Park Christian School better for next year?" that: "I will get in trouble to say."

[¶47]   Singling out the family for special scorn also prompted Zachary to write in his intake in response to the inquiry on what he wanted God to work on in the upcoming year: "Forgiveness to those who have hurt my family."

[¶48]   Scorn was visited upon the family for a host of reasons, including efforts to help by expand educational opportunities for numerous disadvantaged students through paying their tuition.

[¶49]   Defendant PCS wanted tuition money, but not the minority students the Plaintiffs Raymond and Kathrine Kvalvog supported with funds.

[¶50]   Even supply of buses by Plaintiff Raymond Kvalvog for safe transport of the sports  teams for the entire year was targeted.

[¶51]   The Defendant Hannestad was not happy that such transport had been arranged, partially canceled buses, and then allowed the transport to happen only because the Plaintiff Raymond Kvalvog pre-paid for the bus transportation and would not get a refund.

[¶52]   Even with this selfless provision of bus transport, Defendant Hannestad gave express instruction that Plaintiff Raymond Kvalvog could not ride on the very bus he had paid for from his own funds.

[¶53]   The root of Defendant Hannestad's expressed annoyance was that only the boys' sports teams were provided these buses by Plaintiff Raymond Kvalvog, and not the girls volleyball team on which Defendant Hanestad's daughter played.

11

[¶54]   Defendant Hannestad told Plaintiff Raymond Kvalvog expressly to stay out of transportation, which is one major reason that Plaintiff Raymond Kvalvog did not involve himself in transportation to the Wisconsin Dells tournament.

[¶55]   The cold shoulder of intolerance became so great that the Plaintiffs Raymond and Katherine Kvalvog sought to remove their sons from the school and place them at Oak Grove School in Fargo.

[¶56]   Despite repeatedly violating the rules of the Minnesota State High School League, the same rules were employed to keep Zachary and Connor Kvalvog in the fold at PCS at the risk of otherwise losing the ability to play varsity sports.

### [c.]   The tragic crash of June 23, 2015, that took the lives of Zachary and Connor Kvalvog:

[¶57]   It was in the context of this control and culture of retribution that the Kvalvog boys were set to participate in a school event at the Wisconsin Dells basketball tournament.

[¶58]   Defendant Park Christian School controlled every aspect of that school event in much the same way Defendant PCS controlled other aspects of its "family" life[2]

>   1)   Defendant PCS paid the registration fee for the team to participate in the tournament.

---

[2] Note that in the case of <u>Raymond Kvalvog, et al. v. Josh Lee, et al.</u>, 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015), a jury determined that the basketball tournament ***was*** a school event despite the school's best efforts to distance itself from liability by denying it was such an event.

12

2) Defendant PCS completed and submitted the registration form.

3) Defendant PCS made the hotel arrangements.

4) Defendant PCS had the varsity basketball team practicing for the tournament.

5) Defendant PCS had Park Christian School Coaches supervising, leading and controlling the trip, the team participation, and the off court conduct of the players on the trip.

6) Defendant PCS had the players don Park Christian School Falcons team gear prior to departing from the Park Christian School parking lot in a caravan.

7) Defendant PCS inexplicably denied school transport in violation of school policy and instead left the team a caravan of private vehicles to ferry students to the tournament.

8) Defendant PCS had a student driving despite the fact two (2) coaches were in the caravan and one (1) was alone in his vehicle.

9) Defendant PCS by and through Defendant Lee even directed the speed with which the entire caravan would travel to Wisconsin when the two coaches took the lead caravan positions and instructed the third vehicle to keep up.

[¶59] Zachary Kvalvog, who did not seek to be a driver in the caravan, was pressed into service by Defendant Lee and the coercive team culture at PCS, which included making it a mandated duty as captain of the varsity basketball team to arrange transportation, as the driver of his parents 2010 Dodge Ram Pickup, which was designated to be the trailing third vehicle in the caravan.

[¶60]   As the caravan departed the Park Christian School parking lot, Zachary Kvalvog was carrying as passengers his brother Connor Kvalvog, and two other Park Christian basketball team members and friends, Mark Schwandt and Jimmy Morton.

[¶61]   Assistant coach Tim Kerr led the three-vehicle caravan followed by Defendant Lee with no one else in his vehicle and then the Kvalvog vehicle.

[¶62]   As the caravan approached mile marker 68, Assistant Coach Kerr had passed a semi-tractor hauling a trailer, and Defendant Lee was in the process of passing the same semi-tractor and trailer when a passenger in the Kerr vehicle, Tyrell Rodriguez, observed Defendant Lee cut off the semi.

[¶63]   As he cut off the semi, the semi encroached upon the passing lane now occupied by an unsuspecting Zachary Kvalvog.

[¶64]   Zachary Kvalvog attempted to avoid a collision but could not.

[¶65]   The Kvalvog vehicle hurtled into the ditch, down one side and up the other, rolling and becoming airborne as its roof was ripped from the vehicle by the guard rail wire and both personal property of its occupants, as well as Jimmy Morton and Connor Kvalvog were ejected onto the highway.

[¶66]   After barreling though the median, the vehicle with its roof gone and appearing as if it had exploded, crashed down onto the shoulder of the highway where Zachary Kvalvog died still strapped upside down in his seat.

[¶67]   Connor Kvalvog did not die instantly at the scene but landed face down on the highway where Mary Kruger and Deb Van saw him lying like a "like a rag doll" and

pulled him off the highway to prevent having him ran over by traffic while neither coach Kerr nor Defendant Lee rendered assistance.

**[d.]   The Coverup:**

[¶68]   With Defendant PCS's pervasive culture of coercion, scorn and its many violations of MSHSL rules, PCS was motivated to distance itself from responsibility in every way possible so as to avoid liability.

[¶69]   As Zachary and Connor Kvalvog lay on I-94, Defendant Lee did nothing to help them and instead immediately called the leadership at Defendant PCS where the mechanism of the cover up commenced rapidly.

[¶70]   Defendant Lee then provided a fanciful story to law enforcement that he saw every bit of the crash and then checked on his players; a fanciful story Defendant Lee changed in his deposition and again at trial when he openly admitted that he had lied all along.

[¶71]   Defendant Lee's lies were exposed through interviews with other witnesses who said he crept up in his car and then spent the whole time on his phone, not checking on his players and certainly not being with Connor Kvalvog when that young man died.

[¶72]   Despite an arguable duty on the part of coaches to render aid to players, Defendant Lee rendered no assistance to the critically injured sons of the Plaintiffs, who died without the presence of the man who was supposed to be their mentor because he was on his phone talking to school leadership.

[¶73]   Defendant Lee downplayed speed placing it at 75-80 miles per hour.

[¶74]   While Coach Lee was on the phone to the school leadership, Football Coach Tim Kerr drove nine (9) miles down the highway to the next off ramp passing six (6) emergency turn arounds while calling 911 to provide a non-descript narration of the facts that did not reveal the crash involved students he was leading in a caravan.

[¶75]   Like Defendant Lee, Defendant Kerr provided an inaccurate story to law enforcement by downplaying speed by claiming the caravan was travelling at 73 miles per hour while his wife said 70 miles per hour.

[¶76]   Jimmy Morton and Mark Schwandt of speed around 80-85 miles per hours, which was later confirmed up by the forensic assessment of the Airbag Control Module (ACM) of 80-84 conducted by Minnesota State Patrol personnel other than Defendant Eischens.

[¶77]   With the serious discrepancy between Defendants Lee and Kerr on the one hand and the cold hard facts of the ACM and observations of two passengers in the Kvalvog vehicle, Defendant Eischens did not pressure Defendants Lee or Kerr for an explanation, but instead expressly stated in his Crash Reconstruction Report that speed did not cause the crash while expressly stating that "[s]peed, although over the posted speed limit, did not actually cause the crash."

[¶78]   Defendant Eischens was careful to exclude speed as a "cause" of the crash while expressly avoiding any mention that speed was not a "factor" in the crash as he has with vehicle malfunction, alcohol, drugs, road, weather and visibility.

[¶79]   Defendant Eischens later testified at his deposition in a manner that downplayed the role of speed in the crash and simply kept stating that the speed was over the legal limit while refusing to state that any danger ensued from the speed.

[¶80]   The cover up continued when PCS rapidly dispatched communications to PCS's sponsoring churches about the tragic crash and the deaths of Connor and Zachary Kvalvog, but also distancing the school from the crash and any responsibility stating that the Wisconsin Dells tournament was not a school event.

[¶81]   These actions in the early hours after the crash were the first salvos in a long trail of spin and coverup under the guise that the crash was "God's Will".

[¶82]   Left with the horribly violent, graphic and brutal photographic images of the mud covered and broken bodies of their cherished sons, the grief-stricken Plaintiffs Raymond and Katherine Kvalvog wanted answers and the evasiveness of Park Christian School was disturbing.

[¶83]   As emergency response crews arrived on scene, PCS had luck on their side as longtime friend of Defendants Nellermoe and Hannestad, namely Minnesota State Patrol Sargent and Defendant Rod Eichens also arrived on scene and with crash reconstruction experience, he investigated and prepared the primary Crash Reconstruction Report regarding the Kvalvog crash for the Minnesota State Patrol (the "Crash Reconstruction Report").

[¶84]   Defendant Eischens knew from the outset that the crash involved students from Park Christian School as the students were wearing Park Christian uniforms and because

17

in his statement, Defendant Lee stated immediately that he was the head basketball coach at Park Christian School and that he was taking his varsity basketball team to an event.

[¶85]   While serving with the Minnesota State Patrol, Defendant Eischens is subject to Minnesota State Patrol General Order 02-10-029 (hereafter "General Order" or "GO") and its appended Law Enforcement Code of Ethics, both of which govern the conduct of sworn members.

[¶86]   The General Order has its genesis and authority in M.S.A. §626.8457, which mandated establishment of a model policy governing professional conduct of peace officers, and which mandated that the chief law enforcement officer for the Minnesota State Patrol adopt a written policy of conduct for peace officers.

[¶87]   The General Order required to be adopted by Minnesota Statute established mandatory duties of compliance, defined conduct unbecoming an officer and established rules of conduct.

[¶88]   The GO mandates that members ". . . *shall* refrain from *any* conduct in an official capacity that detracts from the public's faith in the integrity of the justice system . . . [M]embers will act *honestly* and with *impartiality*."  Minn. St. Patrol, GO 02-10-029§IV (B) (2002).

[¶89]   The GO mandates that members shall carry out their duties with integrity, fairness and impartiality.  Minn. St. Patrol, GO 02-10-029§IV (B)(1) (2002).

[¶90]   The GO requires that members shall truthfully, completely and impartially report, testify and present evidence, including exculpatory evidence, in all matters of an official nature.  Minn. St. Patrol, GO 02-10-029§IV (B)(2) (2002).

[¶91]   The GO also requires that for the public to have faith in the State Patrol, sworn members avoid conduct that does or could cast doubt on the impartiality of the sworn member or the State Patrol as a whole.  GO 02-10-029§IV (F) (2002).

[¶92]   "Sworn members *shall*, unless *required* by law or policy, refrain from becoming involved in official matters . . . impacting the member's immediate family, relatives or persons, with whom the member has or has had a significant personal relationship."  GO 02-10-029§IV (G)(1) (2002).

[¶93]   Defendant Eischens's personal history repeatedly intersected and was intertwined with business and personal relationships he and his family had with leadership at Park Christian School and its administrators, namely, Defendant Nellermoe, Defendant Hannestad, PCS Board Member June Nygard and their family members.

[¶94]   Defendant Eischens relationship with Defendants Park Christian School, Hannestad and Nellermoe included, but is not necessarily limited to the following:

> 1) Defendant and his family and Defendant Nellermoe and his family have known each other for over 20 years since they were active members of the Community Alliance Church in Detroit Lakes, Minnesota.

> 2) The Eischens and Nellermoe families were all Facebook friends and when Defendant Eischens and his wife, Lisa Eischens celebrated 25 years of marriage, Defendant Nellermoe's wife posted a comment to

Lisa Eischens post of anniversary photos, "LOVE!! Happy 25th, you two!!"

3) Defendant Eischens's wife, Lisa, and Defendant Nellermoe's wife Jeri are also good friends and have attended many reunions and other social events together and engaged in numerous interactions on social media with the most insightful post into their relationship being posted by Jeri Nellermoe referring to the Defendant Eischens and his wife with the sentimental tag, "We Love You Guys!"

4) Eleven (11) days after the deaths of Zachary and Connor Kvalvog, Defendant Eischens held a big July 4 party, but failed to mention that the big party was attended by families from Park Christian School.

5) Defendant Eischens's daughter married a Park Christian School graduate just three (3) weeks after the deaths of Connor and Zachary Kvalvog and many attendees at the wedding included Park Christian School families, including, his friends Defendant Nellermoe and his wife Jeri and Defendant Hannestad's family.

6) Defendant Eischens's new son in-law is not only a Park Christian School graduate, but his son in-law's sister is married to the son of the then Park Christian School President Hannestad.

7) Defendant Eischens's and his wife Lisa have a daughter who owned a Detroit Lakes photography business, which has taken numerous PCS alumni wedding and engagement photos, including Defendant Hannestad's son's wedding, his daughter's wedding, the wedding of the Nellermoe's daughter and the wedding photos of PCS Board member June Nygard's son.

8) Lisa Eischens has referred to Defendant Eischens and Defendant Nellermoe as "identical twins separated at birth" on social media showing the feet of Nellermoe and Eischens side by side.

9) Defendant Eischens's daughter and son in-law attended and participated as a bridesmaid and groomsman in the wedding of former PCS President Hannestad's daughter.

20

10) During litigation in the case, Defendant Eischens, engaged in snapchat messaging with Defendant Nellermoe showing the two had other conversations prior to the messaging and in which the two referred to each other on a first name basis and not with professional salutations referring to each other by job title.  In that snapchat messaging, Defendant Nellermoe is advised by Defendant Eischens to speak to the Park Christian School lawyer about an unknown and yet undisclosed piece of mystery evidence.

[¶95]   The crash report prepared by Defendant Eichens regarding the Kvalvog crash contained false statements of fact and misleading conclusions. The false statements were intentional and known to be false by Defendant Eichens.  The false statements made by Defendant Eichens in his Kvalvog crash report were rooted in his connection to and relationships with Park Christian School and its administrators and their families.

[¶96]   Defendant Eischens assisted his friends at Park Christian School as they sought to avoid liability and continue the official position that this was not a school event.

[¶97]   Conclusions made by Defendant Eichens in his Kvalvog crash report were intentionally inaccurate, incomplete, deceitful and misleading.

[¶98]   Defendant PCS knew Defendant Eischens was protecting them and Jimmy Morton was told by former PCS coach Defendant Lee to stay quiet and not to talk about the crash because Defendant PCS had friends in law enforcement who were dealing with it.

[¶99]   Tyrell Rodriguez was also told by school administration not to discuss the crash because their friends in law enforcement were taking care of it.

[¶100] Because of the personal ties the Defendant Eischens has to the Defendant Nellermoe and to PCS, Defendant Eischens engaged in a systematic effort to mold the

crash report to fit the narrative that absolved PCS of liability by first blaming Zachary Kvalvog exclusively for the crash and later a phantom semi-tractor driver.

[¶101] This initial theory of the case caused passengers in the Kvalvog vehicle to pursue the Kvalvogs for compensation.

[¶102] Defendant Eischens maintained this position blaming Zachary Kvalvog for some period despite having a twenty-six-page (26) statement taken from Jimmy Morton on June 24, 2015, the day after the crash in which Jimmy Morton indicated that a semi-tractor pulling a trailer encroached upon the lane in which the Kvalvog vehicle was travelling; a statement Defendant Eischens denied taking in his official crash reconstruction report.

[¶103] Defendant Eischens never voluntarily revealed that he had this statement and only relented and agreed that it existed when pressed during the Kvalvog civil trial during a deposition conducted by Attorney Mike Bryant nearly three (3) years after the crash.

[¶104] Defendant Eischens not only did not divulge the existence of a twenty-six (26) page statement, but also never had it transcribed, concealing it on a recorder that he used.

[¶105] Defendant Eischens also interviewed Jimmy Morton a second time in which he tried to lead Mr. Morton to answers that would have placed full blame on Zachary Kvalvog for the crash and when Mr. Morton disagreed, and contested Defendant Eischens attempt to put words in Mr. Morton's mouth, Defendant Eischens told Mr. Morton he was "just a black kid" and appeared to be annoyed with Mr. Morton.

[¶106] Jimmy Morton, as a passenger in the Kvalvog truck at the time of the crash, was a survivor with first-hand information. He recalled a semi coming over into the left lane of traffic, forcing Zachary Kvalvog to the edge of the roadway and eventually into the median where the truck began to roll.

[¶107] The first-hand description provided by Jimmy Morton to Defendant Eichens on June 24, 2015 did not match up with the description of the crash given by Defendant Lee and, as a result, Defendant Eichens not only ignored it but covered it up for three (3) years; precious years that could have been used to try and locate the suspect semi-truck.

[¶108] Tyrell Rodriquez, who witnessed Josh Lee cut off the semi-tractor pulling the trailer volunteered to speak with Defendant Eischens and tell him what he had witnessed, but Defendant Eischens never took a statement from Tyrell Rodriguez.

[¶109] Defendant Eischens also disregarded and did not mention diagrams drawn by both Tyrell Rodriguez and Mark Schwandt showing Josh Lee cutting off the semi-tractor pulling the trailer.

[¶110] Despite statements that Defendant Lee cut off the semi-tractor pulling the trailer, Defendant Eischens never probed the story Defendant Lee provided to him and instead accepted it as the narrative of the crash, and to this day has not corrected his report to indicate that this accepted version of events was untrue as Defendant Lee admitted at trial that he had outright lied about many aspects of his story.

23

[¶111] Because Defendant Eichens, based upon his conflict of interest, was initially satisfied with placing the blame for the crash upon Zachary Kvalvog, he was not interested in speaking with any other students who had eye-witness testimony.

[¶112] Defendant Eischens's lack of investigative effort was complimented by his general lack of interest in any serious substantive investigation.

[¶113] At one point, Plaintiff Raymond Kvalvog indicated that there was money missing from his son's wallets and the Defendant Eischens indicated he could do nothing about that.

[¶114] Only when the Plaintiff Raymond Kvalvog implored the Bureau of Criminal Apprehension to investigate was a conclusion reached.

[¶115] Investigation discovered that a Dalton, Minnesota firefighter, Tara Lindquist, had looted the wallets of Zachary and Conner Kvalvog, as well as the wallets of the other passengers.

[¶116] Tara Lindquist held EMS certificate 517401 and initially stipulated to cease providing EMS services under said certification.

[¶117] Tara Lindquist later entered a plea of guilty to misdemeanor theft on January 12, 2016, in Otter Tail County, Minnesota, pursuant to M.S.A. §609.52, subd. (2)(a)(1).

[¶118] Tara Lindquist initial stipulated suspension was revoked, and she was formally suspended by board authority from providing EMS services on August 12, 2016, with the provision that she would be permitted to request reinstatement forty-right (48) months after the Emergency Medical Services Regulatory Board entered its order of suspension.

24

[¶119] To the date of this Complaint, Tara Linquist has not been reinstated.

[¶120] Had Plaintiff Raymond Kvalvog not pressed the issue with BCA, the theft would have remained uninvestigated, as Defendant Eischens showed no interest in doing so and as he expressly stated a desire to wrap up the investigation into the crash while meeting with the Plaintiffs, Raymond and Katherine Kvalvog, close to the end of June 2015 at their residence along with their cousin, Brent Strand.

[¶121] The Defendant Eischens stated he wanted to wrap up the investigation as he was going on vacation around the July 4, 2015, holiday and because his daughter would be getting married shortly thereafter but he failed to mention his daughter was marrying a PCS graduate.

[¶122] The Defendant Eischens conduct validated a desire to wrap the publicly visible portion of the investigation as he conducted no investigation into the conduct of the school and never probed Defendants Josh Lee or Tim Kerr's story.

[¶123] This failure to probe evidence as stated in paragraph 122 did not get answers, but protected the school.

[¶124] Despite the urgency communicated to the Plaintiffs to wrap it up, Defendant Eischens was stealthily communicating with Defendant Nellermoe behind the scenes via a snap chat message about evidence that remains undisclosed to this day, and where Defendant Nellermoe reveals a personal familiarity with Defendant Eischens by referring to him not as Sargent Eischens, but as Rod.

25

[¶125] Why he acted to wrap things up was immediately distressing and troubling to the Plaintiffs, Raymond and Katherine Kvalvog, but it was also perplexing because the Plaintiffs had no idea why the Defendant Eischens acted as he did.

[¶126] Defendant Eischens actions led to requests for a new investigator from almost the beginning of the crash investigation, as Defendant Eischens seemed fixated on blaming Zachary Kvalvog for the crash.

[¶127] Only as time passed did the Plaintiffs, Raymond and Katherine Kvalvog, become aware of initially hidden and underlying reasons for Defendant Eischens actions.

[¶128] Only later inadvertent discovery of Defendant Eischens ties to Defendant PCS through social media showed how close the relationship was.

[¶129] Even at the civil trial in the case of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015), Plaintiff Katherine Kvalvog, privately expressed the sentiment that trial was going well, but that Defendant Eischens was "killing us".

[¶130] Despite the Defendant Lee admitting later he had been drinking on the evening of June 22, 2015, Defendant Eischens did not take a blood test from Defendant Lee because Defendant Eischens never asked whether Defendant Lee had been drinking and disregarded reports that he cut off the semi-tractor towing the trailer.

[¶131] Defendant Eischens did not even secure Defendant Lee's phone records without persistent pressure from Plaintiff Raymond Kvalvog, which showed that he spent much of the post-crash period on the phone in frantic calls to Park Christian School where the upper echelons of leadership were assembled to receive word of the unfolding crisis.

[¶132] Securing those phone records not only showed what Defendant Lee was doing, but provided the variables needed to calculate the average speed of the caravan.

[¶133] The same leadership contended in depositions during the discovery phase of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015), that despite these long frantic phone calls, they never asked Defendant Lee what happened.

[¶134] Defendant Lee did not call 911 once or render aid to his students and Defendant Eischens knew that because other witnesses said Defendant Lee never came to the aid of the Kvalvog boys.

[¶135] The 911 telephone records were once again obtained by Defendant Eischens only upon the insistence of the Plaintiff Raymond Kvalvog after Defendant Eischens indicated he did not know if that was possible and Plaintiff Raymond Kvalvog called the dispatch center to find out.

[¶136] In addition to his manipulation of the crash report, both Defendant Nellermoe and Defendant Eischens failed to disclose their long personal friendship and Defendant Eischens never asked to have another investigator assigned by his Captain, Brian Cheney.

[¶137] Defendant Cheney never assigned a new investigator despite being implored to do so by Plaintiffs Raymond and Katherine Kvalvog within days of the crash because Defendant Eischens stated to the grieving parents that the rumble strips threw the Kvalvog vehicle into the ditch.

[¶138] The concerns of the Plaintiffs became eerily prophetic as they discovered Defendant Eischens failed to tell the same grieving parents that he had a separate

27

conflicting account from Jimmy Morton that was eventually transcribed and covered twenty-six (26) pages.

[¶139] As a result of his conflict of interest and prejudice in favor of Park Christian School and its administrators, the Kvalvog crash report prepared by Defendant Eichens was false, inaccurate, and written in a manner to protect Park Christian School and its administrators from claims of negligence.

[¶140] As a result of his conflict of interest and prejudice in favor of Park Christian School and its administrators, Defendant Eichens manipulated his testimony in his deposition and at trial, deliberately manipulating his words and being evasive to protect his friends, which resulted in an untruthful narrative of the crash.

[¶141] Defendant Eischens evasiveness included complete refusal to commit to the speed of the caravan as dangerous at his deposition where he instead repeatedly referred to the speed as merely over the limit, which supported his crash reconstruction report narrative that speed did not cause the crash.

[¶142] The false and prejudicial Kvalvog crash reconstruction report and the false and misleading testimony of Defendant Eichens concerning the crash was first brought to the attention of his supervisor, Defendant Cheney, by Plaintiffs Raymond and Katherine Kvalvog who met with and asked Defendant Cheney for the Kvalvog crash report to be amended so that it was accurate and truthful or, in the alternative, to assign a different trooper to review the crash data and make a new and fair Kvalvog crash report.

[¶143]   Plaintiffs Raymond and Katherine Kvalvog met with Defendant Cheney many times during the four plus years following the crash to complain about Defendant Eichens and his report because although something seemed amiss with the investigation, the Plaintiffs Raymond and Katherine Kvalvog had no idea what was wrong with it until they discovered, post-trial, that a significant relationship existed between Defendant Eischens and the upper echelons. Notwithstanding these complaints, Defendant Cheney refused to assign a different trooper to the case or have the Defendant Eichens' report changed.

[¶144]   The false and prejudicial Kvalvog crash report and the false and misleading testimony of Defendant Eichens concerning the crash was next brought to the attention of the supervisor for Defendants Cheney and Eichens, Defendant Colonel Matthew Langer.

[¶145]   Plaintiffs Raymond and Katherine Kvalvog met in person with and asked Defendant Langer for the Kvalvog crash report to be amended so that it was accurate and truthful or, in the alternative, to assign a different trooper to review the crash data and make a new and fair Kvalvog crash report.

[¶146]   During a meeting running several hours, Defendant Langer never took a note, dismissed the information and claims of the Plaintiffs Raymond and Katherine Kvalvog and bullied them on their positions throughout their meeting refusing to take any corrective action.

[¶147]   Bewilderingly for the Kvalvogs, Defendant Langer's main concern was that despite inaccuracies that he acknowledged, he refused to change the crash report because it would set a bad precedent for future disputed crash reports, would require examination

of and open up challenge to all reports of Defendant Eischens and would give the State Patrol a black eye.

[¶148] The actions by the Defendants Cheney, Eichens and Langer as the head of the Minnesota State Patrol in relation to this case and the Kvalvog crash, the written report that followed and the follow-up testimony offer by Defendant Eichens, are contrary to and in direct violation of the Code of Conduct.

[¶149] As a result of the actions of the Defendants, the jury in the Kvalvog civil case regarding the crash were provided a deliberately false narrative that the Defendant Eischens intentionally crafted to absolve his friends at Park Christian School of all liability.

[¶150] As a result of the deliberate and deceptive actions of the Defendant Eischens, defense counsel representing the school was able to claim in closing arguments that Defendant Eischens was the witness to be believed because he "had no dog in the fight".

[¶151] As a result of the deliberate and deceptive actions of the Defendant Eischens, defense counsel representing the school was able to bestow upon Defendant Eischens version of events the imprimatur of irreproachable honesty, integrity and credibility calling the jury had to believe the witness "in the purple shirt" evoking the primacy of the papacy and omnipotence of royalty.

[¶152] During this entire presentation, Defendant Nellermoe sat silently, never revealing the long standing personal friendship with Defendant Eischens and his family, not disclosing that he and Eischens had discussed an item of evidence that prompted

30

Defendant Eischens to direct Defendant Nellermoe to speak with his lawyer about the significance of the evidence, knew that the Plaintiffs had no idea of the discussions or friendship between Defendant Eischens and himself, and knew full well that he instructed individuals to keep silent as PCS had friends in law enforcement.

[¶153] The jury returned a not so surprising verdict absolving Defendant Park Christian School and Defendant Josh Lee of all liability and placing sole liability on the phantom truck driver; a version adhered to by Defendant Eischens in his final report, his deposition testimony and testimony at trial.

## COUNT ONE:  AS TO DEFENDANTS PCS, NELLERMOE, HANNESTAD, LEE AND EISCHENS. LIABILITY UNDER 42 U.S.C. §1985

[¶154] Paragraphs 1 through 153 are restated and incorporated herein by reference.

[¶155] From on or about June 23, 2015, up to and including the present time, in the District of Minnesota and elsewhere, the Defendants did knowingly and intentionally combine, conspire, confederate, and agree together with others, both known and unknown for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in the State of Minnesota, with intent to deny to the Plaintiffs due process and the equal protection of the laws, or to injure them in their property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws," in violation of 42 U.S.C. §1985 (2), with said combination, conspiracy, and confederation successfully resulting in the same to the injury and damage of the Plaintiffs.

[¶156] The conspiracy achieved its primary objective on July 26, 2019, when a Clay County jury returned a verdict in favor of Defendants PCS and Lee and is continuing as the Defendants seek to preserve and protect the achievement of that objective.

**Substantive and Procedural Rights Underlying 42 U.S.C. §1985 Remedies**

[¶157] This claim involves a federal statutory remedy involving underlying constitutional and statutory rights, including, but not necessarily limited to:

1) the right to petition one's government for the redress of grievances;

2) the right to due process of law, both procedural and substantive;

3) the right to equal protection of the law;

4) the state recognized rights to compensation for wrongful death and injury.

[¶158] The First Amendment to the Constitution of the United States protects the right to petition the government for the redress of grievances.  U.S. Const. Amend. I.

[¶159] This right includes the ability to petition the government for the redress of grievances by bringing legitimate actions before the courts for judicial determination.  <u>California Motor Transport Co. v. Trucking Unlimited</u>, 404 U.S. 508, 612 (1972).

[¶160] The Constitution of the State of Minnesota protects the ability of ". . . [e]very person . . . to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws."  M.S.A. Const. Art. 1, §8.

[¶161] The right to trial by jury is protected in the State of Minnesota and ". . . shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy."  M.S.A. Const. Art. 1, §4.

[¶162] The Fourteenth Amendment to the United States Constitution prohibits a state from depriving a person of liberty without due process of law.  U.S. Const., Amend XIV.

[¶163] The right to petition the government for the redress of grievances has been incorporated in the Fourteenth Amendment's due process clause and by said incorporation is made applicable to the states.  Phelps-Roper v. City of Manchester, MO., 697 F.3d 678, 686 (8th Cir. 2012).

[¶164] Due process of law is not capable of precise definition, but encompasses a requirement of fundamental fairness, which is central to the right.  Lassiter v. Dept. of Soc. Services of Durham County, N.C., 452 U.S. 18, 24 (1981).

[¶165] What process is due depends largely upon the consideration of three main factors: (1) the private interest that is affected by government action; (2) the risk of erroneous deprivation of that interest under the governmental procedures employed and the probable value of substitute safeguards; and (3) the governmental interest at stake, including, the function involved, the fiscal and administrative burdens that the additional process would entail.  Matthews v. Eldridge, 424 U.S. 319, 335 (1976).

[¶166] "[P]arents desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection."  Lassiter v. Dept. of Soc. Services of Durham County, N.C., 452 U.S. at 27 (citing Stanley v. Illinois, 405 U.S. 645, 651 (1972)).

[¶167] Parents have an interest in the accuracy and justice of judicial decisions and this interest is a commanding one.  Id.

[¶168] The Plaintiffs, Raymond and Katherine Kvalvog, sought justice in the tragic deaths of their sons, Zachary and Connor Kvalvog, through a claim brought before the Seventh Judicial

District Court, County of Clay, State of Minnesota in the case of <u>Raymond Kvalvog, et al. v.</u> <u>Josh Lee, et al.</u>, 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015).

[¶169] The Plaintiffs, Raymond and Katherine Kvalvog, had an important interest in ensuring that the fact finders in the case, namely the jury, would be able to make an accurate and just decision in a proceeding in which fundamental fairness was present.

[¶170] The State of Minnesota recognizes and has created a substantive underlying private cause of action for which full and fair access to the courts is guaranteed, namely, negligence resulting in wrongful death.

[¶171] The State of Minnesota also recognizes employer liability for the negligence of their employees acting within the scope of employment.

[¶172] The State of Minnesota permits parties to have a trial by jury in actions for negligence and it is the jury which fully and fairly adjudicates said claims.

[¶173] A Clay County, Minnesota, jury found that the basketball tournament in Wisconsin was a school event.

[¶174] The Plaintiffs were entitled to have their case properly adjudicated on the merits of the true facts and the law.

[¶175] The allowed the Defendant Lee and by default the Defendant PCS to escape liability for the crash of June 23, 2015.

[¶176] The Plaintiffs allege that the role of Defendant Eischens in investigating and authoring the crash reconstruction report, as well as his testimony at trial corrupted the judicial fact-finding process and directly denied them the rights stated in this Count One and proximately caused their damages.

[¶177]  The Plaintiffs suffered and continue to suffer damages as a result of the corrupted judicial fact-finding process, which includes, but is not necessarily limited to the absolution of Defendants Lee and PCS in any share of the amount awarded by the jury, the cost of the original trial and the ongoing costs to attempt to remedy the corruption injected into the process by the conspirators.

### Overt Acts in Furtherance of Conspiracy.

[¶178]  The Plaintiffs allege that in furtherance of the denial of the rights detailed above, the Defendant Eischens conspired with Defendants Park Christian School, Nellermoe, Hannestad and Lee, individually and with others both known and currently unknown to the Plaintiffs to impede, hinder, obstruct, or defeat the due course of justice in the courts of the State of Minnesota in the case of <u>Raymond Kvalvog, as trustee for the heirs of Zachary and Connor Kvalvog v Josh Lee et. al</u>, 14-CV-16-1457 (7th Jud. Dist., 2015) to absolve Park Christian School from liability in the deaths of Connor and Zachary Kvalvog.  The Plaintiffs allege that the conspirators in this case engaged in a pattern of deceptive acts and omissions with the overt purposes on the part of Defendants Park Christian School, Nellermoe, Hannestad, Lee and Eischens of deflecting the narrative away from a focus upon the liability of Defendant Lee and Park Christian School and onto placement of full liability initially with Zachary Kvalvog's driving and then onto a phantom semi-tractor and trailer that Defendant Eischens did little to identify.  These deceptive acts and omissions included, but are not necessarily limited to:

1) Defendant Eischens hiding of witness statements such as including, a twenty-six (26) page statement taken from a passenger in the vehicle driven by Zachary Kvalvog, namely, Jimmy Morton, just one (1) day after the crash until three (3) years after the crash and after the report was completed and instead deceitfully and falsely stated in his Crash Reconstruction Report that:

35

"After leaving the crash scene after the forensic mapping on June 24, 2015, I drove to Sanford Hospital, Fargo, ND, to speak with Jimmy Morton.  Jimmy described to me how, as Zachary was passing the semi, that it, the semi, came across the centerline into their lane, which caused Zachary to swerve sharply to the left. This event, according to Jimmy, occurred when the Kvalvog vehicle was approximately halfway passed the semi-trailer.  Jimmy estimated the distance the semi was over the centerline to be approximately three feet.  Jimmy recalled the semi-trailer to be only inches away from the right side mirror of the pickup, but there was no contact between the two vehicles that he had recalled.  ***Due to Mortons' medical state and the large amount of medical personnel, family, and friends in his hospital room, I did not take a statement from him at that time.  I did take a recorded statement*** from Morton on ***July 7, 2015.***   This statement is transcribed and contained with the case file."

The bolded statement is false.

2) Defendants PCS, Hannestad, Nellermoe and Eischens concealing conflicts of interest.

3) Defendant Eischens ignoring of the plain evidence that speed played in the crash.

4) Defendants Eischens and Nellermoe Concealing contact between Defendants Eischens and Nellermoe wherein Defendant Eischens advised Defendant Nellermoe to ask the school lawyer about the item of evidence they were discussing with the text revealing said contact only being revealed in other litigation subsequent to the jury verdict of July 26, 2019.

5) Defendants Eischens and Nellermoe concealing to this day what Defendants Eischens and Nellermoe discussed in their text and prior to that.

6) Defendants Nellermoe and Eischens Failing to bring subpoenaed documents to depositions and trial, namely, the piece of evidence referred to in the text message.

7) Defendant Eischens erasing all material from his phone after six (6) months with no regard for the preservation of evidence.

8) Defendant Eischens disregarding offers by an eyewitness to the crash, Tyrell Rodriguez, to provide a statement which was detrimental to Defendants Lee and Park Christian School, and not even returning the witness's phone call.

36

9) Defendant Lee making false statements of fact concerning his position at the time of the crash, his observations of the crash pushing the narrative that Zachary Kvalvog just drove off the rode and his conduct post-crash involving his phone use and assistance to his players never rendered.  Tim Kerr—says nothing of him driving away from accident, speeding, or lying or passing 6 emergency exits in 9 miles before turning around.

10) Defendant Eischens refusal to consider revising his crash report when factual evidence developed disputing his findings, and to this day allowing much of what Defendant Lee stated in post-crash interviews to be the central narrative of what happened even though Defendant Lee admitted in open court that his statements were largely fabricated.

11) Defendant Eischens testifying evasively and deceptively in deposition testimony and at trial.

12) Defendant Eischens deliberate failure to pursue information that was crucial to the investigation such as truck stop footage that Plaintiff Raymond Kvalvog independently secured and independently hired his own expert to analyze, thereby, isolating and identifying the semi-tractor trailer and recovering a partial license plate number.  Such evidence was not immediately sought causing the loss of valuable time in seeking to identify the semi-tractor trailer driver, who would then have verified the observations of the three eyewitnesses, Jimmy Morton, Mark Schwandt and Tyrell Rodriguez, who identified Defendant Lee as having cut off the semi-tractor trailer in statements and in later diagrams completed at the behest of the Plaintiffs Raymond and Katherine Kvalvog's trial counsel, Mike Bryant.  Identifying the semi-tractor and trailer would have placed liability for erratic driving squarely on Defendant Lee.

13) The Plaintiffs also allege that but for the expenditure of further time and funds of the Plaintiffs, and the further insistence of the Plaintiffs, more evidence would have been lost, spoliated, or simply would not have been sought and would be sitting unretrieved.  That evidence included:

     i. Defendant Eischens, a veteran officer was asked to secure 911 call information in the form of both tapes and call logs, but indicated he was not sure that he could do that or how he could do that.   Plaintiff Raymond Kvalvog independently sought to determine whether those records could be secured, determined they could and implored Defendant Eischens to get them, which he reluctantly did.

    ii. The acquisition of documentary evidence also included Defendant Lee's cell phone records, which were only secured upon the insistence and persistence of Plaintiff

Raymond Kvalvog, and those records showed repeated calls to the school that discounted Defendant Lee's story that he rushed to help the Kvalvog brothers when, in fact, he did nothing and allowed Connor Kvalvog to die with strangers who cared enough to stop, and without any effort to help Connor Kvalvog.

14) Defendant Eischens concluded that speed did not cause the crash, and stood by that conclusion despite the fact that the Kvalvog vehicle was a more difficult to control pickup that was going 80-84 mph when it hit the ditch and despite the fact the vehicle would not have even been on the spot in the road where the semi-tractor encroached into Zachary's lane had it not been for Defendant Lee speeding.

15) Defendant Eischens conclusion on speed absolved Defendants Lee and PCS of liability for violation of speed laws by severing the connection between causation and the duty to drive at a safe speed, both of which are elements of a negligence action.

16) Defendant Eischens deliberately and intentionally testified in a manner that maintained the conclusion that speed did not cause the crash to absolve Defendant PSC of liability.

17) Defendant Eischens also overtly ignored the effects of other factors on the crash that reflected badly upon Defendant PCS, such as having a teen driver, the position of the teen driver in the caravan, the fact a teen was a caravan driver with all teen passengers, the road contour, and the vehicle type; none of which reflected well on the actions of Defendant Lee or Defendant PCS.

18) Defendant Eischens initially tried to foster a narrative of the crash that involved Zachary Kvalvog fishtailing, as Defendant Lee's initial statement indicated, and that he then overcorrected and hit the rumble strips which threw him into the ditch. This effort included trying to shape eye-witness testimony such as that of Jimmy Morton. When Defendant Eischens was interviewing Jimmy Mortion a second time on July 7, 2015, Defendant Eischens repeatedly stopped and started the recording as he attempted to mold the statement and tried to get Mr. Morton to validate Defendant Eischens's narrative of events that Zachary Kvalvog was fishtailing and hit the rumble strips, upon which Mr. Morton stated, ". . . I never said any of that".

19) This second interview followed Defendant Eischens initial interview of Jimmy Morton on June 24, 2015, when Defendant Eischens attempted

to influence, intimidate, and undermine the statement of Jimmy Morton that a semi-tractor trailer was involved in the crash by stating to Mr. Morton that he was ". . . just a black kid."

20) Jimmy Morton was told not to speak about the crash by Defendant Lee because the school had friends in law enforcement handling the investigation.

21) Tyrell Rodriguez was told not to speak about the crash by because the school had friends in law enforcement handling the investigation. As were other coaches at the school.

22) All of these overt acts were designed to protect the school from liability by fabricating a crash report to that effect. Defendant Eischens prepared that crash report which contained intentionally false statements of fact and misleading conclusions.

23) Defendant Lee lying to law enforcement with his fanciful narrative after spending precious time following the crash on the phone with the school rather than rendering aid to his players.

24) Defendant Lee openly lying to the Plaintiffs Raymond and Katherine Kvalvog while recounting the facts of the crash in their home and with their cousin Brent Strand.

25) Defendant Lee's public statements reported in the press pushing the closed family narrative of the school and stating that "we don't have to understand what happened" while getting past the crash by resting on hope within the school.

26) Defendant Kerr confabulating a story that he was travelling at 73 miles per hour while the ACM data places the speed of the caravan at 80-84 mph.

27) Defendant Kerr's evasive report of the crash to 911 after speaking to Defendant Lee on the phone following the crash in which he never mentioned any fact linking the Kvalvog vehicle to the school.

28) Defendant Kerr deleted all text messages from his phone following the crash, indicating in February of 2016 that: "I have to delete my texts or

my phone freezes up", but was able to later produce the texts between Plaintiff Raymond Kvalvog and himself.

## COUNT TWO:  AS TO DEFENDANT EISCHENS.
## LIABILITY UNDER 42 U.S.C. §1983

[¶179] Paragraphs 1 through 178 are restated and reincorporated herein by reference.

[¶180] This claim involves a federal statutory remedy involving underlying constitutional and statutory rights, including, but not necessarily limited to:

    1)  the right to petition one's government for the redress of grievances;

    2)  the right to due process of law, both procedural and substantive;

    3)  the right to equal protection of the law;

    4)  the state recognized rights to compensation for wrongful death and injury.

[¶181] The First Amendment to the Constitution of the United States protects the right to petition the government for the redress of grievances.  U.S. Const. Amend. I.

[¶182] This right includes the ability to petition the government for the redress of grievances by bringing legitimate actions before the courts for judicial determination.  _California Motor Transport Co. v. Trucking Unlimited_, 404 U.S. 508, 612 (1972).

[¶183] The Constitution of the State of Minnesota protects the ability of ". . . [e]very person . . . to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws."  M.S.A. Const. Art. 1, §8.

[¶184] The right to trial by jury is protected in the State of Minnesota and ". . . shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy."  M.S.A. Const. Art. 1, §4.

[¶185] The Fourteenth Amendment to the United States Constitution prohibits a state from depriving a person of liberty without due process of law.  U.S. Const., Amend XIV.

[¶186] The right to petition the government for the redress of grievances has been incorporated in the Fourteenth Amendment's due process clause and by said incorporation is made applicable to the states.  Phelps-Roper v. City of Manchester, MO., 697 F.3d 678, 686 (8th Cir. 2012).

[¶187] Due process of law is not capable of precise definition, but encompasses a requirement of fundamental fairness, which is central to the right.  Lassiter v. Dept. of Soc. Services of Durham County, N.C., 452 U.S. 18, 24 (1981).

[¶188] What process is due depends largely upon the consideration of three main factors: (1) the private interest that is affected by government action; (2) the risk of erroneous deprivation of that interest under the governmental procedures employed and the probable value of substitute safeguards; and (3) the governmental interest at stake, including, the function involved, the fiscal and administrative burdens that the additional process would entail.  Matthews v. Eldridge, 424 U.S. 319, 335 (1976).

[¶189] "[P]arents desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection."  Lassiter v. Dept. of Soc. Services of Durham County, N.C., 452 U.S. at 27 (citing Stanley v. Illinois, 405 U.S. 645, 651 (1972)).

[¶190] Parents have an interest in the accuracy and justice of judicial decisions and this interest is a commanding one.  Id.

[¶191] The Plaintiffs, Raymond and Katherine Kvalvog, sought justice in the tragic deaths of their sons, Zachary and Connor Kvalvog, through a claim brought before the Seventh Judicial

District Court, County of Clay, State of Minnesota in the case of <u>Raymond Kvalvog, et al. v. Josh Lee, et al.</u>, 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015).

[¶192] The Plaintiffs, Raymond and Katherine Kvalvog, had an important interest in ensuring that the fact finders in the case, namely the jury, would be able to make an accurate and just decision in a proceeding in which fundamental fairness was present.

[¶193] The State of Minnesota recognizes and has created a substantive underlying private cause of action for which full and fair access to the courts is guaranteed, namely, negligence resulting in wrongful death.

[¶194] The State of Minnesota also recognizes employer liability for the negligence of their employees acting within the scope of employment.

[¶195] The State of Minnesota permits parties to have a trial by jury in actions for negligence and it is the jury which fully and fairly adjudicates said claims.

[¶196] A Clay County, Minnesota, jury found that the basketball tournament in Wisconsin was a school event.

[¶197] The Plaintiffs were entitled to have their case properly adjudicated on the merits of the true facts and the law.

[¶198] The Minnesota State Patrol General Orders establish a duty for all sworn members that they carry out their tasks with fairness and impartiality.

[¶199] Said duty dictates objectivity and ensure impartial and fundamentally fair decisions will be made by our judicial system, including, by juries tasked with the job of fact finding.

[¶200] The risk is great that the Plaintiffs, Raymond and Katherine Kvalvog, would be denied the commanding interest in ensuring an accurate and just decision was made by the jury in the case of <u>Raymond Kvalvog, et al. v. Josh Lee, et al.</u>, 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015)

if a sworn officer did not abide by the dictates of the General Orders that he or she carry out his tasks with fairness and impartiality.

[¶201] Defendant Eischens did not act in compliance with the General Orders in the investigation and compilation of the crash reconstruction report concerning the tragic crash that claimed the lives of Zachary and Connor Kvalvog.

[¶202] Defendant Eischens did not act in compliance with the General Orders in presenting evidence by way of testimony in the case of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015).

[¶203] Defendant Eischens corrupt and dishonest conduct allowed his testimony to be the lynchpin in the closing argument of Defendant PCS's attorneys in the case of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015) where counsel deemed Defendant Eischens to be the one with "no dog in the fight" and allowed counsel to implore the jury that they had to "believe the guy in the purple shirt."

[¶204] Defendant Eischens allowed his bias to be employed to deny due process of law to the Plaintiffs, Raymond and Katherine Kvalvog, to the extent that Defendant Lee and Defendant PCS were absolved of all liability.

[¶205] The Plaintiffs allege that the role of Defendant Eischens in investigating and authoring the crash reconstruction report, as well as his testimony at trial corrupted the judicial fact-finding process and directly denied them the rights stated in this Count Two and proximately caused their damages.

[¶206] The Plaintiffs suffered and continue to suffer damages because of the corrupted judicial fact-finding process, which includes, but is not necessarily limited to the absolution of Defendants Lee and PCS in any share of the amount awarded by the jury, the cost of the original

trial and the ongoing costs to attempt to remedy the corruption injected into the process by the conspirators.

### COUNT THREE:  FRAUD AND DECEIT AS TO DEFENDANT EISCHENS

[¶207] Paragraphs 1 through 206 are restated and reincorporated herein by reference.

[¶208] The written crash reconstruction report completed by the Defendant Eischens concerning the June 24, 2015, crash that claimed the lives of Zachary and Connor Kvalvog contained false statements of material fact and other omissions.

[¶209] The Defendant Eischens's fraudulent statements include, but are not necessarily limited to the following:

1) Stating in his report that he did not take a report from Jimmy Morton on June 24, 2015, despite the fact he recorded a lengthy statement that when transcribed is twenty-six (26) pages long.

2) Providing a narrative of the crash based primarily upon what the Defendant Lee provided as the sequence of factual events.

3) Failing to interview Tyrell Rodriguez, who has testified that Defendant Lee cut off the semi-tractor and trailer that Defendant Eischens ultimately concluded precipitated the crash and, thus, omitting his material information from the report.

4) Stating that speed did not cause the crash while omitting, failing to state that speed was a factor or state whether he considered it a factor in the crash, while at the same time expressly stating that other variables were not a factor in the crash.

[¶210] In statements made to the Plaintiffs and others, as well as his testimony during his deposition and at trial, Defendant Eischens deliberately provided testimony in that he evaded questions, omitted facts and otherwise concealed facts.

1) Failing to inform the Plaintiffs, Raymond and Katherine Kvalvog, that a semi-tractor and trailer were involved in the crash when meeting with them at the end of June 2015, even though he had that information from Jimmy Morton.

44

2)  Adopting the statements of Defendant Lee as to the rumble strips throwing Zachary Kvalvog's vehicle into the ditch when meeting with the Plaintiffs, Raymond and Katherine Kvalvog at the end of June 2015.

3)  Stating to Plaintiffs, Raymond and Katherine Kvalvog, that he could do nothing about theft of money from their son's wallets at the scene of the crash unless he knew how much money was in each wallet, thus, distracting the Plaintiffs from the task of focusing on evidence where time was of the essence and instead re-directing their efforts toward getting the BCA involved in the investigation.

4)  Failure to disclose his many ties to the Defendant PCS and to Defendant Nellermoe and Hannestad.

5)  Failure to disclose a material fact, namely, his *ex parte* contact with the Defendant Nellermoe wherein the two discussed in a snap chat message an item of evidence that Defendant Eischens thought Defendant Nellermoe should talk to his lawyer about.

[¶211] Defendant Eischens knew or should have known that the crash reconstruction report that he authored would be relied upon by the Plaintiffs.

[¶212] Defendant Eischens knew or should have known that the statements he made would be relied upon by the Plaintiffs.

[¶213] The Plaintiffs did rely upon his statements to their detriment.

[¶214] The Plaintiffs have and continue to suffer damages as a result of the fraudulent and deceitful statements.

[¶215] The fraudulent and deceitful statements of the Defendant Eischens proximately caused the damages of the Plaintiffs.

### **COUNT FOUR:  NEGLIGENCE AS TO DEFENDANT EISCHENS**

[¶216] Paragraphs 1 through 215 are restated and incorporated herein by reference.

[¶217] Defendant Eischens is a crash reconstruction investigator and a law enforcement officer charged with carrying out his non-discretionary duty to investigate the evidentiary facts of the

45

crash of June 23, 2015, and compile a crash reconstruction report with due care comporting with the standards for other law enforcement officers in the State of Minnesota.

[¶218] Defendant Eischens is also charged with the duty to present evidence in written or testimonial form with due care and in comportment with the standards expected of law enforcement officers in the State of Minnesota.

[¶219] The Defendant Eischens breached his duty to investigate the crash of June 23, 2015, with due care expected of law enforcement officers in the State of Minnesota.

[¶220] The Defendant Eischens's failure to exercise due care in the investigation of the crash of June 23, 2015, his compilation of the crash reconstruction report and his presentation of written and testimonial evidence include, but are not necessarily limited to the following:

1) Defendant Eischens's hiding of witness statements such as including, a twenty-six (26) page statement taken from a passenger in the vehicle driven by Zachary Kvalvog, namely, Jimmy Morton, just one (1) day after the crash until three (3) years after the crash and after the report was completed.

2) Defendant Eischens's failure to recognize clear conflicts of interest in violation of the General Orders of the Minnesota State Patrol that tainted the investigation, the crash reconstruction report and his presentation of testimonial and written evidence.

3) Defendant Eischens's failure to recognize that factors existed that did or would tend to reflect negatively upon the impartial nature of the investigation, thereby, tainting the results of the crash investigation.

4) Defendant Eischens's deletion of messages from his phone and failure to reveal *ex parte* contact with the Defendant Nellermoe discussing evidence of a nature that remains undisclosed by boh Defendant Nellermoe and Defendant Eischens.

5) Defendant Eischens's failure to bring evidence to his deposition in direct contravention of the subpoena issued pursuant to the authority of the judicial branch of the State of Minnesota.

46

6) Defendant Eischens's failure to interview an eyewitness to the crash, Tyrell Rodriguez, and not even returning the witness's phone call, when the witness later testified that he witnessed the Defendant Lee "cut off" the semi-tractor trailer that Defendant Eischens ultimately determined to be the immediate cause of the crash.

7) Defendant Eischens's failure to follow up and investigate statements by Defendant Lee concerning what he observed in relation to the actual crash and Defendant Lee's post-crash conduct.

8) Defendant Eischens's failure to follow up and investigate statements made by Defendant Kerr concerning speed, his driving nine (9) miles up the highway before turning around despite the pleas of Tyrell Rodriguez to turn around and the availability of emergency turn arounds, and his failure to inquire into the non-descript call by Defendant Kerr to 911 in which he left out details of any association between the Kvalvog vehicle and Defendant PCS and a school event.

9) Defendant Eischens's failure to timely pursue truck stop video where time was of the essence in identifying a semi-tractor trailer and its driver when he knew full well the role of the semi-tractor trailer and its driver in the crash since at least June 24, 2015.

10) Defendant Eischens's failure to secure an alcohol test from Defendant Lee even though Defendant Lee revealed he had been consuming alcohol the night before the crash.

11) Defendant Eischens's conclusion that speed did not cause the crash while failing to acknowledge and stubbornly refusing to acknowledge it as a factor.

12) Defendant Eischens failed to consider the effects of other factors on the crash such as having a teen driver, the position of the teen driver in the caravan, the fact a teen was a caravan driver with all teen passengers, the road contour, and the vehicle type.

13) Failed to transcribe a twenty-six (26) page statement from eye-witness Jimmy Morton taken on June 24, 2015, or even to disclose such a statement was taken until nearly three (3) years after the crash when said statement was material to conclusions drawn in the investigation.

**COUNT FIVE: AS TO DEFENDANT EISCHENS:  SPOLIATION OF EVIDENCE**

[¶221] Paragraphs 1 through 220 are restated and incorporated herein by reference.

[¶222] On June 23, 2015, a crash claimed the lives of Zachary and Connor Kvalvog, and Defendant Eischens was tasked with investigating the crash and issuing a report.

[¶223] As a sworn member of the State Patrol, Defendant Eischens owed a duty of care to the Plaintiffs, Raymond and Katherine Kvalvog, as parents of the late Zachary and Connor Kvalvog and citizens of the State of Minnesota.

[¶224] Automobile crashes routinely result in insurance claims.

[¶225] Automobile crashes routinely result in litigation.

[¶226] Evidence must be preserved as a routine part of any investigation.

[¶227] An experienced peace officer, sworn member of the State Patrol and a crash reconstruction investigator would understand automobile crashes result in insurance claims and litigation.

[¶228] The crash that took the lives of Zachary and Connor Kvalvog involved a semi-tractor trailer and its driver.

[¶229] Defendant Eischens knew a semi-tractor trailer and driver were involved in the crash from on or about at least June 24, 2015.

[¶230] On June 24, 2015, Defendant Eischens was told by eyewitness Jimmy Morton, who was in the Kvalvog vehicle when the crash occurred, that a semi-tractor trailer altered its course and encroached upon the lane in which Zachary Kvalvog was travelling.

48

[¶231] This was crucial information in any investigation, as well as any subsequent potential insurance claim or litigation, as causation is always a central factor in any investigation, insurance claim or litigation.

[¶232] Defendant Eischens allowed crucial time to pass prior to attempting to locate the semi-tractor trailer and its driver.

[¶233] Defendant Eischens did not acknowledge that a semi-tractor trailer was involved in the crash when speaking to the Plaintiffs Raymond and Katherine Kvalvog approximately one week after the crash and instead offered the conclusion that Zachary Kvalvog was thrown into the ditch by the rumble strips, while omitting all mention that he had a twenty-six (26) page statement from Jimmy Morton discussing the semi-tractor trailer in detail.

[¶234] When Defendant Eischens finally did acknowledge that a semi-tractor trailer and its driver were involved in the crash, it was the Plaintiff, Raymond Kvalvog, who secured truck stop footage, hired an expert, had the expert isolate the truck on video and secured a partial plate number for the vehicle.

[¶235] It was the Plaintiff, Raymond Kvalvog, who attempted to enlist the assistance of the public by offering a reward for information on the identity of the semi-tractor trailer and driver on billboards along I-94.

[¶236] Because the Defendant Eischens wasted substantial, valuable time early in the investigation before undertaking even to inform the Plaintiffs, Raymond and Katherine

Kvalvog, that a semi-tractor trailer and driver were involved in the crash, the search for and identification of the vehicle was delayed.

[¶237] Investigation was further delayed as Defendant Eischens took vacation at and around July 4, 2015, and later took time off for his daughter's wedding, all of which are not unreasonable, but without seeking to have another investigator pursue crucial leads.

[¶238] Evidentiary testimony from the driver of said semi-tractor trailer was lost due to the Defendant Eischens failures and his delays in seeking to identify the semi-tractor trailer and its driver.

[¶239] Defendant Eischens also had contact with Defendant Nellermoe during the investigation and advised him to speak to the school's lawyer about a piece of evidence the two discussed.

[¶240] Defendant Eischens deleted the text from his phone and has to this day not presented it in response to a deposition subpoena in the case of <u>Raymond Kvalvog, et al. v. Josh Lee, et al.</u>, 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015).

[¶241] Defendant Eischens never mentioned the contact with Defendant Nellermoe advising him to speak to the school lawyer during his deposition in the case of <u>Raymond Kvalvog, et al. v. Josh Lee, et al.</u>, 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015) or during his trial testimony.

[¶242] As an employee of the State Patrol, Defendant Eischens had a fiduciary duty as an employee of the State of Minnesota to conduct his investigation in an impartial and non-conflicted manner.

[¶243] As a veteran investigator and law enforcement officer, Defendant Eischens knows better than to delete material from his phone when an investigation or civil proceeding is ongoing in which his conduct would be an important factor.

[¶244] Given the conduct discussed in Counts One and Two, the Plaintiffs allege that Defendant Eischens was acting as an agent of Defendants Lee and PCS and should be responsible for the preservation of evidence during or in anticipation of litigation in the same manner as those Defendants.

[¶245] The Plaintiffs allege that the role of Defendant Eischens conduct in allowing and engaging in the spoliation of evidence shut down material avenues of inquiry for the Plaintiffs during discovery.

[¶246] The Plaintiffs allege that the role of Defendant Eischens conduct in allowing and engaging in the spoliation of evidence corrupted the judicial fact-finding process and directly denied them the rights stated in this Counts One and Two and proximately caused their damages.

[¶247] The Plaintiffs suffered and continue to suffer damages because of the corrupted judicial fact-finding process, which includes, but is not necessarily limited to the absolution of Defendants Lee and PCS in any share of the amount awarded by the jury, the cost of the original trial and the ongoing costs to attempt to remedy the corruption injected into the process by the conspirators.

### COUNT SIX:  NEGLIGENT SUPERVISION AS TO THE DEFENDANTS CHENEY, LANGER AND THE MINNESOTA STATE PATROL

[¶248] Paragraphs 1 through 247 are restated and reincorporated herein by reference.

[¶249] Defendant Minnesota State Patrol has in place Minnesota State Patrol General Order 02-10-029 governing the conduct of sworn officers.

[¶250] Defendants Minnesota State Patrol, Cheney and Langer had supervisory authority over the Defendant Eischens.

[¶251] The Defendants Minnesota State Patrol, Cheney and Langer had a duty to ensure the crash reconstruction report was investigated and completed by the Defendant Eischens in compliance with the Minnesota State Patrol General Order 02-10-029 and in compliance with the laws of the State of Minnesota and the United States of America.

[¶252] The Defendants Minnesota State Patrol, Cheney and Langer breached their duty.

[¶253] The Defendant Cheney was informed by the Plaintiffs Raymond and Katherine Kvalvog that they had concerns about Defendant Eischens from early in the investigation and they kept bringing those concerns to Defendant Cheney and asked him for a new investigator.

[¶254] Defendant Minnesota State Patrol by and through Defendant Cheney did nothing.

[¶255] Defendant Minnesota State Patrol by and through Defendant Langer was informed about misstatements, misrepresentations, outright errors and inaccuracies in the crash reconstruction report completed by the Defendant Eischens.

[¶256] Defendant Langer sat through a three hour meeting and never took a note.

[¶257] Defendant Langer expressly stated the Minnesota State Patrol would not correct the report even though he admitted it was in error.

[¶258] Defendants Minnesota State Patrol, Langer and Cheney failed to supervise the work of Defendant Eischens.

[¶259] Plaintiffs Raymond and Katherine Kvalvog have and are continuing to suffer damages as a result of the breach of duty to supervise of Defendants Minnesota State Patrol, Cheney and Eischens.

[¶260] The Defendants Minnesota State Patrol, Cheney and Langer's negligent supervision proximately caused the damages the Plaintiffs have suffered.

## COUNT SEVEN: AS TO DEFENDANTS NELLERMOE AND PARK CHRISTIAN SCHOOL.

[¶261] Paragraphs 1 through 178 are restated and reincorporated herein by reference.

[¶262] Defendant Park Christian School, acting by and through its former Principal and current President, Chris Nellermoe, and Defendant Nellermoe, individually, have made statements about the Plaintiffs, Raymond and Katherine Kvalvog, which include, but are not necessarily limited to the following:

1) That Plaintiffs, Raymond and Katherine Kvalvog, were separated and/or seeking a divorce.

2) That Plaintiff Raymond Kvalvog stole land from another individual and paid former employee of PCS, Austin Schauer, to keep quiet about it.

3) That Plaintiff, Raymond Kvalvog, encountered the Defendant Nellermoe as Defendant Nellermoe jogged by Highway 75 in Moorhead, Minnesota, and that Plaintiff Raymond Kvalvog stopped his vehicle, exited the vehicle, and beat up Defendant Nellermore as he was jogging.

4) That Plaintiff Raymond Kvalvog threatened to kill Defendant Nellermoe's family.

5) That the Plaintiff Raymond Kvalvog cheated in his younger son's football league by having him play up to a higher level.

6) That Plaintiff Raymond Kvalvog publicly exposed a former employee of Park Christian School as a lesbian.

7) That Plaintiff Raymond Kvalvog stalked and harassed the Defendant Nellermoe in the Minneapolis International Airport.

8) That the Plaintiff Raymond Kvalvog appeared on the Joel Heitkamp radio program and disparaged PCS and the Schwandt family.

9) That Austen Schauer should learn where the exits are at Church as Plaintiff Raymond Kvalvog might bring guns to Church and start shooting.

10) That Plaintiff Raymond Kvalvog paid off witnesses.

[¶263] These statements made about Plaintiff Raymond Kvalvog were not true.

[¶264] These statements made about Plaintiff Katherine Kvalvog were not true.

[¶265] The Defendants published these statements to others.

[¶266] These statements were made with the intent to diminish, damage and otherwise harm the credibility and image of Raymond Kvalavog during ongoing and contentious litigation.

[¶267] These statements were made with the intent to diminish, damage and otherwise harm the credibility and image of Katherine Kvalavog during ongoing and contentious litigation.

[¶268] These statements were made intentionally.

[¶269] The Plaintiffs, Raymond and Katherine Kvalvog, have suffered and continue to suffer damage to their reputation, business and personal affairs.

[¶270] Defendant Nellermoe was told to cease and desist in publishing statements made about the Plaintiffs that were untrue, but he has failed to do so.

54

[¶271] Said actions of Defendants are ongoing.

[¶272] The statements made to others by the Defendants proximately caused the damage to the reputation of the Plaintiffs, Raymond and Katherine Kvalvog.

## COUNT EIGHT:  RESPONDEAT SUPERIOR AS TO PARK CHRISTIAN SCHOOL AND THE DEFAMATORY STATEMENTS MADE BY DEFENDANT NELLERMOE

[¶273] Paragraphs 1 through 178 are restated and reincorporated herein by reference.

[¶274] Defendant Nellermoe published defamatory statements to third parties while acting within the scope of his employment first as the principal of Park Christian School and then as the President of Park Christian School.

[¶275] Defendant Park Christian School is legally responsible for the conduct of its employees acting within the scope of employment.

[¶276] The Plaintiffs, Raymond and Katherine Kvalvog, have suffered and continue to suffer damages as a direct result of the ongoing conduct of the Defendant Nellermoe, acting within the scope of his employment, in publishing defamatory statements about them to third parties.

[¶277] Said defamatory statements include but are not necessarily limited to those statements referred to in paragraph 222.

[¶278] The conduct of Defendant Nellermoe proximately caused the damages to the Plaintiffs, Raymond and Katherine Kvalvog.

## COUNT NINE:  AS TO DEFENDANT CHENEY.
## LIABILITY UNDER 42 U.S.C. §1983

[¶279]  Paragraphs 1 through 260 are restated and reincorporated herein by reference.

[¶280]  The First Amendment to the Constitution of the United States protects the right to petition the government for the redress of grievances.  U.S. Const. Amend. I.

[¶281]  This right to liberty includes the ability to petition the government for the redress of grievances and inherent in that right is the ability to petition any and all branches of government, including, the right to bring legitimate actions before the courts for judicial determination. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 612 (1972).

[¶282]  The Fourteenth Amendment to the United States Constitution prohibits a state from depriving a person of liberty without due process of law.  U.S. Const., Amend XIV.

[¶283]  The right to petition the government for the redress of grievances has been incorporated in the Fourteenth Amendment's due process clause and by said incorporation is made applicable to the states.  Phelps-Roper v. City of Manchester, MO., 697 F.3d 678, 686 (8th Cir. 2012).

[¶284]  Due process of law is not capable of precise definition, but encompasses a requirement of fundamental fairness, which is central to the right.  Lassiter v. Dept. of Soc. Services of Durham County, N.C., 452 U.S. 18, 24 (1981).

[¶285]  What process is due depends largely upon the consideration of three main factors: (1) the private interest that is effected by government action; (2) the risk of erroneous deprivation of that interest under the governmental procedures employed and the probable value of substitute safeguards; and (3) the governmental interest at stake, including, the function involved, the fiscal and administrative burdens that the additional process would entail.  Matthews v. Eldridge, 424 U.S. 319, 335 (1976).

[¶286] "[P]arents desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection." Lassiter v. Dept. of Soc. Services of Durham County, N.C., 452 U.S. at 27 (citing Stanley v. Illinois, 405 U.S. 645, 651 (1972)).

[¶287] Parents have an interest in the accuracy and justice of judicial decisions and this interest is a commanding one. Id.

[¶288] The Defendant Eischens continued a pattern of biased investigation into the crash that was observed from the first interaction the Plaintiffs, Raymond and Katherine Kvalvog had with him and eventually issued a crash reconstruction report riddled with inaccurate and untruthful information.

[¶289] The Plaintiffs, Raymond and Katherine Kvalvog later sought justice in the tragic deaths of their sons, Zachary and Connor Kvalvog, through a claim brought before the Seventh Judicial District Court, County of Clay, State of Minnesota in the case of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015).

[¶290] The Plaintiffs, Raymond and Katherine Kvalvog, had an important interest in ensuring that the fact finders in the case, namely the jury, would be able to make an accurate and just decision.

[¶291] The Plaintiffs, Raymond and Katherine Kvalvog, had an interest in ensuring the investigation into the deadly crash of June 23, 2015, was carried out impartially and fairly.

[¶292] The Minnesota State Patrol General Orders establish a duty for all sworn members that they carry out their tasks with fairness and impartiality.

[¶293] Said duty dictates objectivity and ensure impartial and fundamentally fair decisions will be made by our judicial system, including, by juries tasked with the job of fact finding.

[¶294] The risk is great that the Plaintiffs, Raymond and Katherine Kvalvog, would be denied the commanding interest in ensuring an accurate and just decision was made by the jury in the case of <u>Raymond Kvalvog, et al. v. Josh Lee, et al.</u>, 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015) if a sworn officer did not abide by the dictates of the General Orders that he or she carry out his tasks with fairness and impartiality.

[¶295] The Plaintiffs, Raymond and Katherine Kvalvog, raised concerns about the motivations of Defendant Eischens almost from the first moment the investigation commenced into the June 23, 2015, crash that killed Zachary and Connor Kvalvog.

[¶296] Plaintiff Raymond Kvalvog begged Defendant Cheney to assign a new investigator.

[¶297] Defendant Cheney ignored the Plaintiff Kvalvog's pleas.

[¶298] Defendant Eischens corrupt and dishonest conduct allowed his testimony to be the lynchpin in the closing argument of Defendant PCS's attorneys in the case of <u>Raymond Kvalvog, et al. v. Josh Lee, et al.</u>, 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015) where counsel deemed Defendant Eischens to be the one with "no dog in the fight" and allowed counsel to implore the jury that they had to "believe the guy in the purple shirt."

[¶299] Defendant Eischens allowed his bias to be employed to deny due process of law to the Plaintiffs, Raymond and Katherine Kvalvog, to the extent that Defendant Lee and Defendant PCS were absolved of all liability and Defendant Cheney was informed and did nothing to ensure a denial of fundamental fairness in the investigation did not occur, even though as Defendant Eischens.s supervisor, Defendant Cheney had a responsibility to make sure the investigation was properly conducted.

[¶300] Defendant Cheney actively maintained Defendant Eischens as the lead investigator despite concerns being brought to his attention and that active maintenance of Defendant

Eischens as lead investigator resulted in a verdict colored by corruption of the judicial process absolving Defendants PCS and Lee.

[¶301] The Plaintiffs, Raymond and Katherine Kvalvog, suffered damages as a result of the active failure of Defendant Cheney.

[¶302] Defendant Cheney's conduct in the case proximately caused the deprivation of the Plaintiffs, Raymond and Katherine Kvalvog's civil rights, and the accompanying financial damages suffered by them, which are ongoing and substantial.

### COUNT TEN:  AS TO DEFENDANT LANGER. LIABILITY UNDER 42 U.S.C. §1983

[¶303] Paragraphs 1 through 260 are restated and incorporated herein by reference.

[¶304] The First Amendment to the Constitution of the United States protects the right to petition the government for the redress of grievances.  U.S. Const. Amend. I.

[¶305] This right to liberty includes the ability to petition the government for the redress of grievances and inherent in that right is the ability to petition any and all branches of government, including, the right to bring legitimate actions before the courts for judicial determination. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 612 (1972).

[¶306] The Fourteenth Amendment to the United States Constitution prohibits a state from depriving a person of liberty without due process of law.  U.S. Const., Amend XIV.

[¶307] The right to petition the government for the redress of grievances has been incorporated in the Fourteenth Amendment's due process clause and by said incorporation is made applicable to the states.  Phelps-Roper v. City of Manchester, MO., 697 F.3d 678, 686 (8th Cir. 2012).

[¶308] Due process of law is not capable of precise definition, but encompasses a requirement of fundamental fairness, which is central to the right.  Lassiter v. Dept. of Soc. Services of Durham County, N.C., 452 U.S. 18, 24 (1981).

[¶309] What process is due depends largely upon the consideration of three main factors: (1) the private interest that is effected by government action; (2) the risk of erroneous deprivation of that interest under the governmental procedures employed and the probable value of substitute safeguards; and (3) the governmental interest at stake, including, the function involved, the fiscal and administrative burdens that the additional process would entail.  Matthews v. Eldridge, 424 U.S. 319, 335 (1976).

[¶310] "[P]arents desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection."  Lassiter v. Dept. of Soc. Services of Durham County, N.C., 452 U.S. at 27 (citing Stanley v. Illinois, 405 U.S. 645, 651 (1972)).

[¶311] Parents have an interest in the accuracy and justice of judicial decisions and this interest is a commanding one.  Id.

[¶312] The Plaintiffs, Raymond and Katherine Kvalvog, raised concerns about the motivations of Defendant Eischens almost from the first moment the investigation commenced into the June 23, 2015, crash that killed Zachary and Connor Kvalvog.

[¶313] The Plaintiffs, Raymond and Katherine Kvalvog sought justice in the tragic deaths of their sons, Zachary and Connor Kvalvog, through a claim brought before the Seventh Judicial District Court, County of Clay, State of Minnesota in the case of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015).

[¶314] The Plaintiffs, Raymond and Katherine Kvalvog, had an important interest in ensuring that the fact finders in the case, namely the jury, would be able to make an accurate and just decision.

[¶315] The Plaintiffs, Raymond and Katherine Kvalvog, had an interest in ensuring the investigation into the deadly crash of June 23, 2015, was carried out impartially and fairly.

[¶316] The Minnesota State Patrol General Orders establish a duty for all sworn members that they carry out their tasks with fairness and impartiality.

[¶317] Said duty dictates objectivity and ensure impartial and fundamentally fair decisions will be made by our judicial system, including, by juries tasked with the job of fact finding.

[¶318] The GO also dictates that sworn members avoid conflicts of interest.

[¶319] The risk is great that the Plaintiffs, Raymond and Katherine Kvalvog, would be denied the commanding interest in ensuring an accurate and just decision was made by the jury in the case of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015) if a sworn officer did not abide by the dictates of the General Orders that he or she carry out his tasks with fairness and impartiality.

[¶320] Following the July 26, 2019, jury verdict in the case of Raymond Kvalvog, et al. v. Josh Lee, et al., 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015), the Plaintiffs, Raymond and Katherine Kvalvog have sought various forms of relief, including, a new trial and an appeal seeking reversal of the jury verdict.

[¶321] Conflicts of interest on the part of Defendant Eischens were brought to the attention of Defendant Langer in a three hour meeting with the Plaintiffs, Raymond and Katherine Kvalvog at the offices of Senator Kent Eaken.

[¶322] During the meeting in Senator Eaken's office, Defendant Langer took no notes, but was apprized of the errors in Defendant Eischens's report.

[¶323] Present at the meeting with Senator Kent Eaken, Jimmy Morton, Raymond Kvalvog, Katherine Kvalvog, Fred Dahnke and Scott MacCallum, who is a former State Patrol member and accident reconstructionist.

[¶324] Defendant Langer acknowledged that errors were made in the report but stated that it would not be changed because that would open a can of worms.

[¶325] Defendant Langer acknowledged that errors were made in the crash reconstruction report but stated the report would not be changed because that would give the Patrol a black eye.

[¶326] Plaintiffs, Raymond and Katherine Kvalvog were unaware of the extensive conflicts of interest involving Defendant Eischens at the time of the meeting, but they raised the concerns about the conduct of Defendant Eischens in a complaint filed with the Internal Affairs office of the State Patrol where an in-depth investigation was conducted.

[¶327] A report was prepared by IA investigator Lynn Mueller, which was then provided to Defendant Langer.

[¶328] Defendant Langer is the individual with ultimate disciplinary authority over Defendant Eischens and yet he took no action.

[¶329] The report has not been provided to the Plaintiffs, Raymond and Katherine Kvalvog and remains undisclosed.

[¶330] No disciplinary action was taken against Defendant Eischens.

[¶331] The Plaintiffs quest to correct the errors in the report and to address the conflicts of interest remain unaddressed and their quest for justice in the case of Raymond Kvalvog, et al. v.

<u>Josh Lee, et al.</u>, 14-CV-16-4157 (Minn. 7th Jud. Dist., 2015) remains unfulfilled because the Defendant Langer has allowed the interests of the State Patrol to override the public interest.

[¶332] The Plaintiffs suffered a denial of due process when the Defendant Langer failed to correct the report and failed to address the conflicts of interest involving Defendant Eischens.

[¶333] Defendant Langer's conduct in the case is perpetuating the continued deprivation of the Plaintiffs, Raymond and Katherine Kvalvog's civil rights, and is a proximate cause for continued financial damages suffered by them, which are ongoing and substantial.

## JURY DEMAND

[¶334] Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

NOW THEREFORE, based upon the foregoing, the Plaintiff requests this court enter judgment as follows:

1. For recovery of all legally permissible economic and non-economic damages in an amount to be established at trial

2. For all costs, attorney's fees and other disbursements, as permitted by law and as the court deems just, proper and equitable.

3. For such other further relief as the Court and jury deem just and proper upon consideration of this case.

Dated this 6th day of July 2021.

/S/ David J. Chapman

_____

David J. Chapman, Attorney At Law
(Minnesota Attorney #0283857)
D J Chapman Law
3155 Bluestem Drive, PMB #388
West Fargo, ND  58078
(701) 232-5899
FAX: (701) 540-0569
dchapman@djchapmanlaw.com
Attorney for Plaintiffs

64